**IN THE COURT OF APPEALS OF IOWA**

No. 14-1823
Filed November 25, 2015

**JAMIE SWANSON and LISA SWANSON,**
     Plaintiffs-Appellants,

**vs.**

**R & B FEEDS, L.L.C.,**
     Defendant-Appellee.
_____

     Appeal from the Iowa District Court for Cass County, James Heckerman,

Judge.

     Jamie and Lisa Swanson appeal following the trial court's verdict denying

some of their claims arising from feed-related damage to their cattle.

**AFFIRMED.**

     Eldon L. McAfee and Erin C. Herbold of Brick Gentry, P.C., West Des

Moines, and Justin E. LaVan of Bradshaw, Fowler, Proctor, and Fairgrave, P.C.,

Des Moines, for appellants.

     Rene Charles LaPierre of Klass Law Firm, L.L.P., Sioux City, for appellee.

     Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Jamie and Lisa Swanson appeal following the trial court's verdict denying some of their claims arising from feed-related damage to their cattle. They contend the trial court erred in rejecting their negligence and strict liability theories of recovery, calculating damages, and refusing to award business interruption damages, punitive damages, and pre-trial attorney fees. We do not disturb the trial court's findings underlying its conclusions that the Swansons did not prove business interruption damages. Nor did the trial court err in calculating damages, rejecting the claim for punitive damage, and refusing the claim for pre-trial attorney fees. We therefore affirm.

**I. Background Facts and Proceedings.**

Jamie and Lisa Swanson purchase bred heifers from "out west." In the spring, they sell some of the cow/calf pairs to their clientele, and then "run the rest." The Swansons keep 150 to 200 cattle, feed them through the year, and sell them at the end of the year, sometimes "hold[ing] back heifers or cows to breed" depending upon the price of feed, the availability of pasture, and the quality of the animal.

In September 2012, the Swansons had cattle in different holding areas on their farm. In one, were forty home-raised, weaned calves and, in a second area, were thirty-eight or thirty-nine cows and calves the Swansons had purchased from Colorado. On September 20, 118 cows and 119 calves arrived at the

Swansons farm that they had purchased from a respected breeder in Nebraska. Cattle from this breeder were available due to drought conditions in Nebraska.[1]

For the Colorado and Nebraska calves, Jamie ordered "creep feed" mixed with Rumensin from Rex McDermott of R & B Feeds. (Creep feed is a pelleted food and Rumensin is a feed additive that is supposed to increase feed efficiency. However, an excess amount of Rumensin can be toxic.) R & B Feeds delivered 10,375 pounds of feed on September 20. The feed was placed in two creep feeders in the pen with the Nebraska calves.[2] An additional 4072 pounds of feed was delivered on September 28 and was placed in a creep feeder in with the Colorado calves.

On Friday, October 5, 2012, the Swansons attempted to order sack feed for the home-raised calves but R & B Feeds was closed for inventory. So, they extracted five buckets of creep feed from one of the feeders in the Nebraska cattle pen (feeder #1), mixed it with three buckets of shelled corn, and fed it to their forty weaned calves. All of the feed was consumed. On Saturday, October 6, the Swansons again dipped five buckets of creep feed from the feeder #1, mixed it with corn, and took it to the pen with the weaned calves. The calves did not "come charging up to the bunk like usual." The Swansons did not give the calves any more feed but left baled grass hay they could eat. On October 7, the weaned calves were lethargic and were having respiratory problems. By the afternoon, one of the weaned calves had died and the other thirty-nine "were

---

[1] Jamie Swanson described visiting the Nebraska ranch and seeing the cattle: "The calves were in phenomenal shame [sic]. The cows were sucked down. The heifers were exquisite. I mean they were just fine, fine animals."
[2] No cows had access to the creep feed—only calves.

showing signs of something." The Nebraska and Colorado cattle were not showing any signs of distress at this time. Over the next several days, twenty of the home-raised calves died.

On October 12, 2012, one of the Nebraska calves was staggering and had the same symptoms seen in the home-raised calves. Jamie removed from the pen six to eight Nebraska calves that did not "look quite right"; they were struggling to breathe and were staggering. As the calves were being led away, one fell over dead. Rex McDermott removed the two creep feeders from the Nebraska cattle pen. He was to remove the creep feeder from the Colorado pen as well but did not do so until October 28.[3]

Eventually, testing showed the creep feed in feeder #1 contained excess amounts of Rumensin. Dr. Steve Ensley, a veterinary toxicologist in the diagnostic lab at Iowa State University determined at least two of the calves died from exposure to excess ionophore.

> Q. And so is that—I guess why don't you explain what is ionophore toxicosis? A. The ionophores are a group of compounds we use in animals for increasing feed efficiency and also can use as a coccidiostat. There's several different types of ionophores commercially available.
> Q. All right. Is Rumensin one of them? A. Rumensin is the generic—monensin is the generic name. Rumensin is the trade name. That's a commonly used ionophore in your cattle.
> Q. And if cattle have the ionophore toxicosis, what does that mean as far as—what effects does that have on cattle? A. Normally the—the target of the ionophore toxicosis is the skeletal and myocardial muscle so those muscles—the skeletal myocardial muscles will be damaged from an overdose.

---

[3] On October 12, Rex was arrested for domestic abuse and went to jail. His absence from R & B Feeds created a void that his wife, Beth McDermott (who was recovering from injuries), and his brother, Matt McDermott, tried to step into; however, neither Beth nor Matt were normally involved in the day-to-day operations of R & B Feeds.

Q. And so then in terms of what you would observe in a particular calf that has ionophore toxicosis, what would that look like? A. Typically, the clinical signs can be compatible with heart failure. It depends on the degree of damage to the heart. Sometimes we can see acute death with no—with no—or minimal clinical signs. So we can see an acute death with—with this myocardial damage also.

Q. Does ionophore toxicosis always lead to death? A. It depends on the severity of the damage. It's—it's dose related. There's—there can be quite—quite a bit of variability between the damage that occurs depending on the dose ingested.

Q. So if a group of calves receive a large dose of Rumensin and only some of them die out of that group, will the ones that survive be perfectly healthy if they have suffered from ionophore toxicosis? A. It—it depends—it depends on the dose they received and the damage. The LD50 that we talked about monensin in cattle is 26.4 milligrams per kilogram. And so depending on how closely we approach that dose, that's what we expect, 50 percent of the animals consuming that dose to die and then less than that dose we would see a variable death loss associated with exposure. But we can see animals that don't—don't—that don't observe—don't have any observable clinical signs still have significant damage to the heart and can—can die at—at a later time after the—you know, variable period of time after the exposure.

Q. Now back to Exhibit 22. Ultimately, what [are] your findings as to why calf number three and calf number four died? A. My findings from the history, the clinical history, the previous clinical history, the necropsy findings supplied from Dr. Hoffman, my microscopic findings, other clinical testing that we did, was that the death of these two animals was caused by myocardial necrosis that was consistent with an ionophore toxicosis.

Q. And in your opinion would this be consistent with consuming excess Rumensin in the Swansons' cattle? A. The cause of death in the case of these two animals specifically I think is from an ionophore, most likely monensin. That's what—that's what they—from the history from Dr. Hoffman, that's what we had exposure to and that would be compatible with what I found.

In addition to the twenty home-raised, weaned calves that died, two of the Nebraska calves and one of the Colorado calves died. The Swansons weaned and fed out the remaining 170 calves, and sold them at auction in February 2013 with a disclaimer that they had been inadvertently fed Rumensin and were sold "as is."

The Swansons brought this suit against R & B Feeds, alleging negligence, breach of implied warranty for fitness for a particular purpose, and breach of duty voluntarily assumed. They asserted R & B Feeds was strictly liable for resulting damages from a hazardous and dangerous condition of feed. They sought compensatory, business interruption, and punitive damages. The case was tried to the court without a jury. At the close of the evidence after a three-day trial, the court dismissed the claim for punitive damages. The court indicated it intended to find in favor of the Swansons on the claim of "breach of implied warranty as it relates to that substance [Rumensin] and the breach is in terms of breach of contract and implied warranty." The trial court stated,

> I'm going to give you an amount o[r] number that I think makes you whole as of the date of the sale in . . . February of 2013. . . . I'm going to give you enough money to get you back to where you were that day. Your history doesn't show that you're holding stuff back. You're selling it every year. But you're telling me that that—no, these were wonderful calves and they were the best I've ever seen. I'm not going to argue with you. I don't know the first thing about cattle. And maybe that's—you were—there was a change in plan. But if you had a change in plan, I don't give you the higher number just because you make a change in plan that day. I'm giving you enough money to make you whole and you do with it as you wish. . . . I'm trying to make you whole at that time.

The court specifically stated it was not relying on theories of strict liability and breach of duty voluntarily assumed. It entered its ruling on August 27, 2014, finding total damages of $169,081.87. The parties agreed the total included a duplicate entry, and the court reduced the damages to $164,072.54.

The Swansons filed a post-trial motion requesting enlarged and amended findings on the negligence, strict liability, and pre-litigation attorney and expert witness fees, which the court overruled:

The Court finds that the Plaintiff[s] failed to establish liability based on negligence and strict liability, and even if the Court had ruled otherwise, the Plaintiffs are only entitled to the damages set forth in the Court's order. The Court found that the damages set forth in Ex. 48,[4] the document prepared by Evan Vermeer, was the best measure of damages, and it is the determination of the Court that Plaintiff's failed to prove that the sale of the additional thirty three cows and nine heifers was necessary or reasonable as a result of Defendant's breach of implied warranty.

The Court found that the Plaintiffs were not entitled to an award for attorney fees. The Court's further review of *Berryhill v. Hatt*, 428 N.W.2d 647 (Iowa 1988), does not change the opinion of the Court.

Judgment was entered on October 13, 2014.

The Swansons appeal, arguing:

At issue in this case is: (1) whether the District Court erred when it held that the Swansons did not prove negligence; (2) whether the District Court erred when it held that the Swansons did not prove strict liability; (3) whether the Swansons should have been awarded business interruption damages consistent with this Court's ruling in *Ballard v. Amana Society* and whether the appropriate remedy is for this Court to cure the error by awarding business interruption damages in the amount established by uncontroverted evidence without further need for remand. 526 N.W.2d 558 (Iowa 1995); (4) whether the district court erred in not awarding punitive damages and attorney fees, including pre-litigation attorney fees and; (5) whether the District Court erred in not including in the award losses for nine heifers and 33 cows established by the evidence at trial.

## II. Scope and Standard of Review.

We review for errors of law. Iowa R. App. P. 6.907. The trial court's findings of fact are binding upon us if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a). We view the evidence in the light most favorable to the verdict, taking into consideration all reasonable inferences that could fairly arise. *See Kiesau v. Bantz*, 686 N.W.2d 164, 171 (Iowa 2004).

---

[4] We presume the trial court misspoke as Evan Vermeer's calculations are included in exhibit 28.

**III. Discussion.**

*A. Business interruption damages.* The first three of the Swansons' complaints on appeal concern their insistence that the trial court did not make them whole because it refused to award business-interruption damages. Relying on *Ballard v. Amana Society*, *Inc.*, 526 N.W.2d 558 (Iowa 1995), they contend the trial court "avoided an analysis of any business interruption damages" by denying their negligence and strict liability claims.

*Ballard* involved a farrow-to-finish hog operation, involving breeding sows and raising their litters for slaughter. 526 N.W.2d at 559. Corn containing toxins was delivered and fed to the swine herd, causing the death of several hogs and a reduction or elimination of the sows' reproductive abilities. *See id.* at 559-60. There, our supreme court affirmed damages for lost profit for four years' of business interruption while the Ballards worked to reestablish their herd at a historically typical level of production. *Id.* at 561-62. Such damages were available because the Ballards' business of breeding sows was diminished by the toxic corn and "the injuries to the Ballards' swine herd support damages in tort." *Id.* at 562; *see also Rozeboom Dairy*, *Inc. v. Valley Dairy Farm Automation*, *Inc.*, No. 09-1447, 2011 WL 662338, at *7 (Iowa Ct. App. Feb. 23, 2011) ("The injuries to Rozeboom's [dairy] herd are similar to the injuries in *Ballard*, where the hazard was "peripheral to the sale and a serious product defect" that caused property other than the product to sustain damage. . . . We believe the injuries to Rozeboom's herd support damages in tort."). The Swansons' contend they are owed more than $700,000 for a six-year business interruption beginning in 2013 and ending in 2018-19.

The Swansons' complaints on appeal—that the trial court should have found they had proved their negligence and strict liability claims and thus awarded business interruption and lost profits damages—ignore the more basic problem. The trial court found the Swansons did not have a cattle operation analogous to the swine operation in *Ballard*. In *Ballard*, the lost-profit evidence was based upon the comparison of "expected profit level to the actual profits experienced by the Ballards." 526 N.W.2d at 561. The Swansons did not have a history of such profits upon which to base an expected profit.[5] While Jamie Swanson testified that once the Swansons obtained the Nebraska calves they considered a different business plan, the trial court rejected awarding business interruption damages because, "Your history doesn't show that you're holding stuff back. You're selling it every year." This finding is supported by substantial evidence, including the Swansons' tax returns, and the testimony of their banker, Keith Honke:

> [T]he original plan before they received [the Nebraska cows and calves] was to—if I recall to—to turn and sell the cows probably as quickly as they can and to keep the calves for a while, put a little weight on 'em, give it a little time for a marketing opportunity. We felt that we had to turn the cows fairly quickly because typically in those situations the cows don't present the marketing opportunity. It's the calves. Cows just eat a lot of feed.
> . . . .
> Q. And then the—at—was there any plan to save back any heifers at this point? A. Well, at the time when—when we were talking about purchasing, I don't recall about keeping the calves for breeding purposes, no.

---

[5] We note that in *Ballard*, 526 N.W.2d at 562, the supreme court found no error in the trial court submitting both strict-liability and breach-of-warranty theories because of "the injuries to the Ballards' swine herd" and "significant business interruption." But the trial court did not find those types of damages existed here.

The defendant's expert, Dr. Daniel Little, testified in response to a question whether his analysis would be different if the Swansons had a business plan to hold back ninety-three heifers for breeding stock:

> [W]hat you're inferring is that they're changing how they've been doing business in the previous years and absolutely no indication in any of their records that—with their banker and detailed notes, the cash flow projections, all of the things that are in the file that have been provided to me, there is absolutely no indication that they had an intent to change how they've been doing business buying and selling cattle. They make their money on buying pregnant cows, calving them out and selling the cow/calf pairs.

Under the circumstances of this case and the facts found by the trial court, the court did not err in refusing to award business interruption damages.

*B. Denial of punitive damages and attorney's fees.* The Swansons assert the facts of this case warrant an award of punitive damages. In order to recover punitive damages, the Swansons must establish by a preponderance of clear, convincing, and satisfactory evidence that the defendant's conduct amounted to a willful and wanton disregard for the rights or safety of another. *See* Iowa Code § 668A.1 (2011); *see also Fell v. Kewanee Farm Equip. Co.*, *Div. of Allied Prods.*, 457 N.W.2d 911, 919 (Iowa 1990). Willful and wanton conduct requires a showing that the actor has "'intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which, thus, is usually accompanied by a conscious indifference to the consequences.'" *Fell*, 457 N.W.2d at 919 (citation omitted). Punitive damages are only appropriate when actual or legal malice is shown. *McClure v. Walgreen Co.*, 613 N.W.2d 225, 231 (Iowa 2000). "Actual malice is characterized by such factors as personal spite, hatred, or ill will. Legal

malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights." *Id.* (citation omitted).

"Punitive damages are always discretionary, and are not a matter of right." *Berryhill v. Hatt*, 428 N.W.2d 647, 656 (Iowa 1988). The allowance of punitive damages "rests with the fact finder." *Page Cnty. Appliance Ctr., Inc. v. Honeywell, Inc.*, 347 N.W.2d 171, 179 (Iowa 1984).

At the close of the Swansons' case in chief, R & B Feeds moved for a directed verdict on the issue of punitive damages. The Swansons resisted, arguing:

> [T]here was a clear reckless disregard for the property rights of Jamie and Lisa Swanson in this case. . . . Your Honor, the testimony has been pretty clear that a feed label was required and never provided. And when requested they were provided a wrong feed label. . . . By not having any feed labels and totally disregarding the law, R & B Feeds prolonged and added additional damages to the Swansons.

The trial court concluded, however:

> We all know the standard is wanton and willful disregard for the safety or property of others and the Court finds . . . you're correct in perhaps the labeling or absence of labeling may have contributed to other damages but I don't believe this rises to a situation where anybody on behalf of the defendant acted in complete and total disregard for the welfare and safety of the individuals or the property of the plaintiffs. For that reason the Court will sustain the motion for directed verdict as it relates to punitive damages.

We find no reason to disagree with the trial court's finding against such an award. The Swansons note Beth McDermott's failure to provide a feed tag that included the additives when requested and Rex McDermott's failure to remove the last creep feeder. These factors are likely due to Rex's arrest and unavailability and the resulting void left by his absence at R & B Feeds. In any

event, in light of the trial court's finding that the defendant's conduct was not willful and wanton, we do not disturb the denial of punitive damages.

*C. Denial of attorney fees.* On appeal, the Swansons contend there are two grounds for an award of attorney fees: (1) common law attorney fees and (2) as consequential damages under *Berryhill*, 428 N.W.2d at 657. We disagree.

"A party generally has no claim for attorney fees as damages in the absence of a statutory or written contractual provision allowing such an award." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, 510 N.W.2d 153, 158 (Iowa 1993). The claim for common law attorney fees is reserved for the "rare exception . . . 'when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* (citation omitted). The trial court did not find wanton conduct and denied attorney fees. We do not find this case to be that rare exception warranting common law attorney fees.

The Swansons next point to the district court's ruling denying a motion for partial summary judgment and its included statement, "All pre-suit attorney fees are recoverable under *Berryhill v. Hatt*, 428 N.W.2d 647 (Iowa 1988)." In *Berryhill*, 428 N.W.2d at 657, the court found "[attorney] fees charged for services rendered in trying to get [a party] to perform the contract after the breach, but before filing suit, could be considered by the jury as consequential damages." In denying summary judgment, the district court here stated, "Whether the facts support a claim for consequential and incidental damages is a question for the fact-finder and is not appropriate to determine at this summary judgment stage."

At trial, Lisa Swanson testified that part of the expenses they were seeking included "legal prelitigation line item of [$]8199.50."

Q. Is that legal fees that you incurred in this case? A. That is the legal fees that I've incurred up 'til the time when suit was filed.

Q. And did you pay those fees? A. Yes, I have.

Q. And if we turn to Plaintiff's Exhibit 36. A. Yes.

Q. Now other than the—there's the—there's a description section that's been redacted from Exhibit 36. And other than that do these look like the statements you would have received from my law firm? A. Correct.

Q. And if you add up the amount of prelitigation fees in this case, is that where the number 8,199.50 comes from? A. Correct.

The defendant objected to the admission of exhibit 36, arguing:

The absence of the description of what these legal services were goes a lot to saying what the fees and expenses are for. So I object because it's not a full and complete billing statement because there's no description, can't tell whether the fees are fair, reasonable, ordinary and customary or anything off the Plaintiff's Exhibit 36.

THE COURT: I believe that goes to the weight to be given to the evidence, not its admissibility. Exhibit 36 is received.

The trial court did not award pre-suit attorney fees as consequential damages following trial. We do not do so now.

*D. Additional damages.* Finally, the Swansons urge this court to "provide damages for 33 cows that were mistakenly not included in Evan Vermeer's damage calculation for 'cow discount due to later marketing,' but were harmed by R & B Feed's actions." Vermeer's calculations in Exhibit 28 lists 120 cows discounted due to later marketing and 153 cows fed for an additional sixty days. Lisa mentioned in her answers to cross-examination questions their exhibit was incorrect and the 120 discounted cows should also total 153 cows. The Swansons did not raise this claim in their post-trial motion, but the trial court

rejected it for lack of proof of causation. We see no reason to disagree with the court's determination of damages based on the record.[6]

**AFFIRMED.**

---

[6] The appellants' brief explains:

> Exhibit 28 listed "Cow discount due to later marketing $180/head times 120 head." The actual number of head listed should be 153 cows as testified to by Lisa Swanson. (App. at 103). Thus damages should include an additional 33 cows for the discount due to later marketing. This would add an additional $5,940 to the total damages. (33 head x $180 = $5,940). For the number following "cow discount due to later marketing," Mr. Vermeer listed "cow feed for 60 additional days $2.50/head times 153 head." . . .
>
> Additionally, Lisa Swanson testified to the cost of an additional nine replacement heifers that died as a figure that should be included in damages, not found in Plaintiff's Trial Exhibit 28. Evan Vermeer estimated that the nine heifers would have brought $1.65/lb (App. at 134), however, he stated that a quality replacement heifer, like the Swansons had, would cost $1250. (App. at 77-78).

Mr. Vermeer's calculations included damages for the death of nine heifers ($8167.50) and a different figure for the cost of replacing nine breeding heifers ($11,280). The record is not clear whether these damages are duplicative or why Lisa Swanson now contends the court should have added to her expert's damage calculations.